**No. 25-50262**

**In the United States Court of Appeals for the Fifth Circuit**

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

LUIS MUNIZ-ESPINOZA,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Western District of Texas

---

# BRIEF OF DEFENDANT-APPELLANT

---

SHANE O'NEAL
O'NEAL LAW
101 E. Avenue B
Alpine, Texas 79830
(713) 51603595
shane@shaneoneallaw.com

*Attorney for Defendant-Appellant*

# CERTIFICATE OF INTERESTED PERSONS

**UNITED STATES v. LUIS MUNIZ-ESPINOZA,**
**No. 25-50262**

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1. **Ernesto Villarreal,** Defendant-Appellant;

2. **Justin R. Simmons,** Interim U.S. Attorney;

3. **Amy Greenbaum,** Assistant U.S. Attorney, who represented Plaintiff-Appellee in the district court;

4. **Shane O'Neal,** who represented Defendant-Appellant in the district court and continues to represent him in this Court; and

5. **Zachary R. Richter,** who represents Plaintiff-Appellee in this Court.

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

s/ Shane O'Neal
SHANE O'NEAL
*Attorney for Defendant-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Muniz-Espinoza requests oral argument. This case involves a preserved constitutional challenge that has divided judges across the country and on which this Court has not written.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................i

STATEMENT REGARDING ORAL ARGUMENT ......................... ii

TABLE OF AUTHORITIES ..........................................................vi

SUBJECT MATTER AND APPELLATE JURISDICTION ............1

ISSUES PRESENTED FOR REVIEW .............................................2

STATEMENT OF THE CASE .........................................................3

SUMMARY OF THE ARGUMENT .................................................9

ARGUMENT AND AUTHORITIES ...............................................12

Section 2423(c), (g)(1) is facially unconstitutional and unconstitutional as-applied to Muniz-Espinoza. ......................12

A. The meaning of § 2423(c), (g)(1) as indicted and proven at trial shows that the government obtained a conviction for Muniz-Espinoza engaging in noncommercial, illicit sexual conduct while residing temporarily in Mexico.........................14

B. Prior cases interpreting the reach of constitutional powers must be re-evaluated considering the history and tradition approach.....................................................................18

C. Standard of Review. ..........................................................21

D. Section 2423(c), (g)(1) both facially and as-applied to Muniz-Espinoza is an unconstitutional attempt to exercise Congress's commerce power. ..................................................21

1. The framers did not understand the Foreign Commerce Clause to reach the regulation of noncommercial acts occurring inside a foreign country.........................................................................22

a. The original understanding of "commerce." .................22

b. The original understanding of when commerce is "with foreign nations." ........ 23

c. Congress's power to regulate commerce with foreign nations is broader than its power to regulate commerce among the states. ........ 28

2. Under an original understanding of the Foreign Commerce Clause, Section 2423(c) is facially unconstitutional. ........ 32

3. Even under the Lopez framework, § 2423(c), (g)(1) is facially unconstitutional because non-commercial illicit sexual conduct, even if aggregated, cannot affect commercial sex. ........ 37

D. The power to make all laws necessary and proper to making treaties does not provide Congress with the power to enact Section 2423(c), (g)(1) ........ 48

1. Holland requires a meaningful inquiry into whether legislation is necessary to the implementation of a treaty and a proper means of achieving the treaty's goals. ........ 49

2. Section 2423(c), (g)(1) is neither properly considered implementing legislation nor a necessary or proper method of executing the Optional Protocol ........ 52

a. Section 2423(c) is not an implementing statute. ........ 52

b. Even if Section 2423(c) could be considered implementing legislation, it is neither necessary nor proper ........ 55

E. Even if some applications of § 2423(c), (g)(1) are constitutional, its application here—to noncommercial, intrafamilial abuse that occurred outside the channels of commerce—exceeded the government's constitutional powers. ........ 60

1. Congress's power to regulate commerce with foreign nations did not justify its regulation of Muniz-Espinoza's non-commercial, intrafamilial illicit sexual conduct. ........ 63

2. Congress's treaty power does not justify its regulation of Muniz-Espinoza's non-commercial, intrafamilial illicit sexual conduct. ........ 66

CONCLUSION ........ 68

CERTIFICATE OF SERVICE ........ 69

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ........ 70

## TABLE OF AUTHORITIES

### Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935) .......... 38

*Batson v. United States*,
580 U.S. 1182 (2017) .......... 20

*Bd. Of Trustees v. United States*,
289 U.S. 48 (1933) .......... 29

*Bond v. United States*,
572 U.S. 844 (2014) .......... 13, 59, 60

*Boos v. Barry*,
485 U.S. 312 (1988) .......... 51

*Champion v. Ames*,
188 U.S. 231 (1903) .......... 36

*Cohens v. Virginia*,
6 What. 264 (1821) .......... 13

*Complete Auto Transit, Inc. v. Brady*,
430 U.S. 274 (1977) .......... 30

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......... 22

*Dobbs v. Jackson Women's Health Organization*,
597 U.S. 215 (2022) .......... 18

*Gibbons v. Ogden*,
22 U.S. 1 (1824) .......... passim

*Gonzales v. Raich*,
545 U.S. 1 (2005) .......... passim

*Haaland v. Brackeen*,
599 U.S. 255 (2023) .......... 27

*Hoke v. United States*,
227 U.S. 308 (1913) .......... 36

*In re Bonvillian Marine Serv., Inc.*,
19 F.4th 787 (5th Cir. 2021) .......... 20

*Japan Line, Ltd., v. County of L.A.*,
441 U.S. 434 (1979) .......... 28, 29, 30, 35

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) .......... 52

*Medellin v. Texas*,
552 U.S. 491 (2008) .......... 48

*Michelin Tire Corp. v. Wages*,
423 U.S. 276 (1976) .......... 29

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022) .......... 18, 35, 60

*The Schooner Exch. v. McFaddon*,
11 U.S. (7 Cranch) 116 (1812) .......... 25

*Trump v. United States*,
603 U.S. 593603 U.S. 593 (2024) .......... 19

*United States ex re. Attorney General v. Delaware & Hudson Co.*,
213 U.S. 366 (1909) .......... 15

*United States v. Al-Maliki*,
787 F.3d 784 (6th Cir. 2015) .......... 42, 47, 64

*United States v. Bianchi*,
Case No. 09–2664,
386 F. App'x 156 (3d Cir. 2010) .......... 33, 42

*United States v. Bollinger*,
798 F.3d 201 (4th Cir. 2015) .......... 44, 45, 46

*United States v. Bredimus*,
352 F.3d 200 (5th Cir. 2003) .......... 13, 34, 35

*United States v. Clark*, 435 F.3d 1100 (9th Cir. 2006) ............21, 32

*United States v. Clay*,
128 F.4th 163 (3d. Cir. 2025) ............................................... passim

*United States v. Connelly*,
117 F.4th 269 (5th Cir. 2024) ................................................21, 62

*United States v. Durham*,
902 F.3d 1180 (10th Cir. 2018) ..................................................33

*United States v. Ho*,
311 F.3d 589 (5th Cir. 2002) ..................................................13, 39

*United States v. Kallestad*,
236 F.3d 225 (5th Cir. 2000) .......................................................42

*United States v. Lara*,
541 U.S. 193 (2004) ....................................................................27

*United States v. Morrison*,
529 U.S. 598 (2000) ............................................................ passim

*United States v. Palomares*,
52 F.4th 640 (5th Cir. 2022) ........................................................16

*United States v. Park*,
938 F.3d 354 (D.C. Cir. 2019) ..................................56, 57, 65, 68

*United States v. Pepe*,
895 F.3d 679 (9th Cir. 2018) ........................................15, 16, 68

*United States v. Rahimi*,
602 U.S. 680 (2024) ..................................................18, 19, 60, 62

*United States v. Reed*,
Case No. 15-188,
2017 WL 3208458 (D.D.C. Jul, 27, 2017) ........................... passim

*United States v. Rife*,
33 F.4th 838 (6th Cir. 2022) ............................................33, 49, 57

*United States v. Salerno*,
481 U.S. 739 (1987) .......... 62

*Vidal v. Elster*,
602 U.S. 286 (2024) .......... 18

**Statutes**

18 U.S.C. § 2243(a) .......... 12

18 U.S.C. § 2423(a) .......... 53

18 U.S.C. § 2423(b) .......... passim

18 U.S.C. § 2423(g)(1) .......... 4, 6, 12, 14

18 U.S.C. § 3231 .......... 1

18 U.S.C. § 3742(a) .......... 1

18 U.S.C. § 922(g)(3) .......... 62

28 U.S.C. § 1291 .......... 1

**Rules**

Fed. R. App. P. 32(a)(5) .......... 70

Fed. R. App. P. 32(a)(6) .......... 70

Fed. R. App. P. 32(a)(7)(B) .......... 70

Fed. R. App. P. 32(f) .......... 70

Fed. R. App. P. 4(b)(1)(A)(i) .......... 1

**Other Authorities**

1 S. Johnson, A Dictionary of the English Language 361 (4th 3d.
1773) .......... 23

Anthony J. Colangelo, *The Foreign Commerce Clause*, 96 Va. L. Rev. 949 (2010) .......... passim

Christopher R. Green, *Tribes, Nations, States: Our Three Commerce Powers*, 127 Penn St. L. Rev. 643 (2023) .......... 26

Edmund Randolph, *Opinion on the Constitutionality of the Bank* (1791) in 21 The Documentary History of the First Federal Congress of the United States of American 1789–91 (Charlene Bangs Bickford ed., 2017) .......... 27

Georg Frederich von Martens, *Summary of the Law of Nations, Founded on the Treaties and Customs of the Modern Nations of Europe* 145 (William Cobbett trans., 1795) .......... 24

H.R. Rep. No. 107-252 (2002) .......... 53

H.R. Rep. No. 107–525 (2002) .......... 42

S. Treaty Doc. No. 106–37 (July 5, 2000), 2000 WL 33366017 .......... 54, 55

*See* H.R. Rep. No. 108–66 (2003) (Cong. Rep.) .......... 42

*Travel*, Merriam-Webster, https://www.merriam-webster.com/dictionary/travel (last visited Nov. 8, 2017) .......... 15

**Constitutional Provisions**

U.S. Const. amend. X .......... 50

U.S. Const. art. I § 8, cl. 3 .......... 21

U.S. Const. art. I, § 8, cl. 18 .......... 49

U.S. Const. art. II, sec. 2, cl. 2 .......... 48

## SUBJECT MATTER AND APPELLATE JURISDICTION

**1. Subject Matter Jurisdiction in the District Court.** The district court had jurisdiction of this case under 18 U.S.C. § 3231.

**2. Jurisdiction in the Court of Appeals.** This Court has jurisdiction of the appeal under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

A criminal defendant who wishes to appeal a district court judgment must file a notice of appeal in the district court within 14 days after the judgment's entry. Fed. R. App. P. 4(b)(1)(A)(i). In this case, the judgment was entered on March 31, 2025. ROA.6. Muniz-Espinoza filed a notice of appeal on April 4, 2025. ROA.6.

## ISSUES PRESENTED FOR REVIEW

1. Whether 18 U.S.C. § 2423(c), (g)(1) is constitutional facially or as-applied to Muniz-Espinoza.

## STATEMENT OF THE CASE

Muniz-Espinoza engaged in illicit sexual activity while he temporarily resided in Mexico. The facts showed that his acts had no impact on commerce nor was the federal government's regulation of it necessary and proper to the implementation of a treaty that seeks to eradicate the commercial market for child sex.

The facts of this case are straightforward and undisputed. They were stipulated to introduced at trial as the sole evidence against him.

*Facts constituting the charged offense.*

On May 17, 2024, Muniz-Espinoza traveled from Fort Stockton, Texas, to Ocampo, Coahuila, Mexico, in his personal vehicle. ROA.192. He crossed the border through the Del Rio—Acuna port of entry, then traveled to his parents' residence in Ocampo. ROA.192. He did not stop at any waypoint—other than to refuel— or use any means of travel other than his personal vehicle until he arrived at his parents' house. ROA.192

His parents' house was his destination; he intended to stay with them. ROA.192. Muniz-Espinoza had recently lost his job in the United States because his driver's license was suspended.

ROA.192. He did not have a planned date to return to the United States. ROA.192.

At his parents' house, he encountered several family members including CHILD VICTIM 1, a 14-year-old minor. ROA.192. Muniz-Espinoza did not know before arriving at his parents' house that CHILD VICTIM 1 would be there. ROA.193.

CHILD VICTIM 1 had traveled to Muniz-Espinoza's the house in Ocampo without his involvement. ROA.193. She traveled with her mother and others. ROA.193 That travel occurred on May 15, 2024. ROA.193. CHILD VICTIM 1 and her family stayed in Acuna, Mexico on May 15 and arrived at Muniz-Espinoza's parents' home in Ocampo on May 16. ROA.193. Muniz-Espinoza arrived at the house on May 17. ROA.193. Muniz-Espinoza had purchased beers that he shared with the family members at the house, including CHILD VICTIM 1. ROA.193.

While in Mexico, staying at his parents' house, Muniz-Espinoza engaged in illicit sexual conduct, as defined in 18 U.S.C. § 2423(g)(1), with CHILD VICTIM 1. ROA.193. That conduct occurred the day after Muniz-Espinoza had arrived. ROA. 193.

Muniz-Espinoza did not give anything of value to CHILD VICTIM 1, promise to do anything for her, force, or compel her to

engage in the sexual conduct. ROA.193. Muniz-Espinoza had not planned to engage in sexual conduct with CHILD VICTIM 1; it was a spur-of-the-moment decision. ROA.193.

Muniz-Espinoza is a U.S. citizen by naturalization. ROA.193.

A day after the sexual contact between Muniz-Espinoza and CHILD VICTIM 1, CHILD VICTIM 1 returned to the United States. ROA.194.

Muniz-Espinoza stayed in Mexico for two months, helping his family as a handyman for his sister-in-law's rental-house business and obtaining a Mexican identification card that listed his residence as Ocampo, Coahuila, Mexico. ROA.194. Muniz-Espinoza attempted to travel to the United States on July 12, 2024, when he was arrested for this offense. ROA.194.

*Procedural facts.*

The government indicted Muniz-Espinoza for engaging in illicit sexual conduct with a minor abroad, in violation of 18 U.S.C. § 2423(c). ROA.8. The indictment alleged that Muniz-Espinoza, being "a citizen of the United States, knowingly traveled in foreign commerce, from Del Rio, Texas, Port of Entry in the United States of America, into the Republic of Mexico, and engaged in illicit sexual conduct, as defined in Title 18 United States Code, Section

2423(f),[1] with Child Victim 1, a minor less than 18 years of age, . . .” ROA.8.

Muniz-Espinoza moved to dismiss the indictment because § 2423(c), (g)(1) is an unconstitutional exercise of Congress’s Commerce Clause power both facially and as-applied to him. ROA.36-63. The government responded that the statutes were a valid exercise of Congress’s power to regulate commerce, as well as a necessary and proper means of exercising Congress’s commerce power to regulate child-sex trafficking. ROA.76-83.

When he filed his motion to dismiss, Muniz-Espinoza attached a document called, “Stipulations and Affidavit,” laying out the government’s allegations and the evidence against him and admitting what he had done. ROA.61-63.

[1] 18 U.S.C. § 2423(c) was amended, effective December 22, 2023—prior to the commission of the offense and indictment, to add a subsection unrelated to this case. Throughout the litigation, the parties and the district court referred to 18 U.S.C. § 2423(c) and **(f)**, ROA.8, ROA.38, ROA.102, but it appears that the correct citation was to 18 U.S.C. § 2423(c) and **(g)**. For accuracy, Muniz-Espinoza will refer to section (g) in this motion.

The district court denied Muniz-Espinoza's motion to dismiss. ROA.98-120. The district court recognized the "challenging" nature of the question and "varying" opinions of "courts nationwide," but concluded that "Congress acted appropriately under its Foreign Commerce Clause power by regulating noncommercial sexual conduct abroad because it substantially affects commerce, thus meeting the rational basis standard in *Lopez*." ROA.98-99.

Muniz-Espinoza waived his right to jury trial. ROA.63, ROA.124. The district court held a bench trial on December 17, 2024. ROA.89.

Five days prior to the trial, on December 12, Muniz-Espinoza filed a motion in limine. ROA.90-97. The motion in limine interpreted 18 U.S.C. § 2423(c) as setting out three crimes, all of which require a U.S. citizen to engage in illicit sexual conduct but: Crime 1 occurs while the defendant travels in foreign commerce; Crime 2 occurs while a defendant resides temporarily in a foreign country; and Crime 3 occurs while a defendant resides permanently in a foreign country. ROA.92. Muniz-Espinoza argued that the government indicted him only for Crime 1 and urged the district court

not to permit the government to constructively amend the indictment. ROA.90-92. The district court granted Muniz-Espinoza's motion. ROA.5.

Muniz-Espinoza predicted that the government's evidence would show only that Muniz-Espinoza committed Crime 2. ROA.93, ROA.95. The day of trial, Muniz-Espinoza submitted two proposed "charges to the fact finder," based on his interpretation of "traveling" and "and," as laid out in the motion in limine. ROA.121-23.

At the stipulated bench trial, the government offered Exhibit 1. ROA.142. Muniz-Espinoza objected "not to the authenticity of Government's Exhibit 1," but "only . . . to the extent that it violates the motion in limine," and clarified "[b]ut we agree with the facts set out in it." ROA.142. The district court ultimately admitted Government's Exhibit 1, "without objection, with the exception" as stated by defense counsel. ROA.154-55.

The government rested. ROA.155. Muniz-Espinoza moved for judgment of acquittal. ROA.155. The district court denied that motion. ROA.155-56. The defense rested, and the district court found Muniz-Espinoza guilty. ROA.156–57.

The district court imposed a top-of-the-Guidelines sentence of 71 months' imprisonment. ROA.187, ROA.128. That sentence of imprisonment was followed by five years' supervised release, with mandatory, standard, and special conditions, ROA.130-33, as well as a $100 fine, ROA.134.

Muniz-Espinoza appealed. ROA.135.

## SUMMARY OF THE ARGUMENT

**18 U.S.C. § 2423(c), (g)(1) is an unconstitutional exercise of both Congress's commerce power and power to make laws necessary to effect the president's treaty power.**

The commerce clause, as originally understood, was limited to regulating the United States selling something to, buying something from, bartering something with, or shipping something to another nation. It did not extend to regulating actions internal to a foreign country, not did it extend to regulating a U.S. citizen's noncommercial acts in a foreign country.

18 U.S.C. § 2423(c), (g)(1) punishes a U.S. citizen engaging in illicit sexual conduct abroad. The conduct is noncommercial, occurs within a foreign country, and is not with a foreign nation; rather, it is with another person in a foreign nation. Thus, § 2423(c), (g)(1) cannot be justified as part of Congress's foreign commerce

power. Even if the reach of the power were extended to activities that substantially affect foreign commerce, a U.S. citizen's non-commercial illicit sex abroad, even when aggregated, does not affect foreign commerce. That is true even if the failure to regulate it arguably makes commercial illicit sex harder to regulate.

The treaty power, along with Congress's power to make laws necessary to effect treaties, similarly does not authorize § 2423(c), (g)(1). There is no indication that Congress intended § 2423(c) to be necessary to implement the treaty. Further, § 2423(c), (g)(1) is not necessary to implement the treaty because the treaty explicitly states that it does not require its parties to sanction noncommercial sex with minors. Finally, the treaty is not a proper exercise of Congress's power. As originally understood, the power to execute treaties did not involve achieving a treaty's goals but rather the procedural job of effecting the treaty. Also, implementing the treaty in this way would require exceeding the enumerated, limited powers that the Constitution authorizes.

Even if Congress is authorized to take any steps that will help eradicate the international child sex market, § 2423(c), (g)(1) is not related to that goal as-applied to Muniz-Espinoza. Muniz-Espinoza's conduct, while reprehensible, is markedly removed from

the child sex market. The parties agreed that his conduct was non-commercial, intrafamilial, not planned prior to his international travel, and not engaged in while he was in transit. Thus, Muniz-Espinoza occupies a subset of § 2423(c) offenders for whom the application of the statute is entirely divorced from the commerce and treaty powers.

# ARGUMENT AND AUTHORITIES

**Section 2423(c), (g)(1) is facially unconstitutional and unconstitutional as-applied to Muniz-Espinoza.**

Section 2423(c), (g)(1), punishes U.S. citizens who engage in noncommercial, illicit sexual conduct while traveling to or residing in a foreign country. The relevant statute criminalizes:

> [a]ny United States citizen . . . who travels in foreign commerce or resides, either temporarily or permanently, in a foreign country, and engages in any illicit sexual conduct . . . .
>
> [T]he term 'illicit sexual conduct' means—(1) a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the . . . jurisdiction of the United States . . . .

18 U.S.C. § 2423(c), (g)(1).[2]

Section 2246 and chapter 109A make it a crime for a U.S. citizen to have sexual contact with someone who is between the ages of 12 and 16 years old if the citizen is more than four years their senior. 18 U.S.C. § 2243(a).

Here, the district court convicted Muniz-Espinoza of violating § 2423(c), (g)(1) by having non-commercial sex with a minor family

[2] The definition of "illicit sexual conduct" also includes "any commercial sex act" and the "production of child pornography," but those provisions are not at issue in this case. ROA.8, ROA.191–94.

member in Mexico. The parties agreed that both Muniz-Espinoza and the minor traveled to Mexico separately, had not known that each other would be there, had not planned any sexual conduct ahead of time, had not exchanged anything of value, and had traveled back to the United States separately. ROA.191–94.

"Pursuant to" the aim of "protection of our fundamental liberties," "the Framers devised a federal government of limited and enumerated powers." *United States v. Bredimus*, 352 F.3d 200, 204 (5th Cir. 2003). Those powers are "few and defined." *United States v. Lopez*, 514 U.S. 549, 552 (1995). This enumeration reduces "the risk of tyranny and abuse from" the federal government. *Lopez*, 514 U.S. at 442. And, it does so by "den[ying] to Congress" a "general police power." *United States v. Ho*, 311 F.3d 589, 597 (5th Cir. 2002); *see also Bond v. United States*, 572 U.S. 844, 854 (2014) ("For nearly two centuries it has been clear that, lacking a police power, Congress cannot punish felonies generally.") (quoting *Cohens v. Virginia*, 6 What. 264, 428 (1821)).

The judges to thus far consider the constitutionality of § 2423(c), (g)(1) have looked to two enumerated powers for authorization: (1) the power to regulate commerce and (2) the power to make laws necessary and proper to effect treaties. Those judges have reached

vastly different conclusions about both the statute's constitutionality.

Determining whether § 2423(c), (g)(1) is a constitutional exercise of Congress's powers requires both that the Court interpret the statute as well as the constitutional provisions.

**A. The meaning of § 2423(c), (g)(1) as indicted and proven at trial shows that the government obtained a conviction for Muniz-Espinoza engaging in noncommercial, illicit sexual conduct while residing temporarily in Mexico.**

Section 2423(c), (g)(1) punishes U.S. citizens who engage in noncommercial, illicit sexual conduct while traveling to or residing in a foreign country. Section 2423(c), however, can be separated into three separate crimes: engaging in illicit sexual conduct while (1) traveling in foreign commerce, (2) residing temporarily in a foreign country, or (3) residing permanently in a foreign country.

The reach of § 2423(c), Crime 1 depends on both the definition of "travels" as well as "*and* engages in illicit sexual conduct." There are two reasonable constructions of § 2423(c)'s use of the word "travels." "Travels" could be limited to "transits." For example, "[o]ne travels in that sense by 'mov[ing] . . . from one place to another.' But 'travel' could also have the broader meaning of 'go[ing] on a . . . trip or tour.'" *United States v. Pepe*, 895 F.3d 679, 685 (9th Cir.

2018) (quoting *Travel*, Merriam-Webster, https://www.merriam-webster.com/dictionary/travel (last visited Nov. 8, 2017)).

"[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *United States ex re. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909). As will be elaborated below, there are constitutional questions about Congress's ability to regulate non-commercial activity internal to a foreign country.

If § 2423, Crime 1 is limited to illicit sexual conduct that occurs within the channels of foreign commerce, the case for constitutionality is notably stronger. If, however, the meaning of "travels" is expanded to "going on a trip or tour," § 2423(c), Crime 1 would sanction conduct that occurs outside of the channels of commerce because someone can be on a tour, yet temporarily outside of the channels of commerce. The canon of constitutional avoidance, therefore, supports the narrow interpretation of "travels" as meaning "in transit."

But, it is not enough to interpret "travels" alone, the remaining questions is whether "and" means "and concurrently" or "and thereafter." *Pepe*, 895 F.3d at 687. Both the cannon of constitutional

avoidance and the text require that it be interpreted as "and concurrently," meaning that Crime 1 applies to illicit sexual conduct that occurs while someone travels in foreign commerce. The reasons for rejecting "and thereafter" are particularly clear when considering Crimes 2 and 3, which occur when someone resides in a foreign country "and engages in illicit sexual conduct."

First, if "and" meant "and thereafter," Crime 1 would apply to anyone who traveled in foreign commerce and later engaged in illicit sexual conduct, making Crimes 2 and 3 largely surplusage. "The canon against surplusage is the interpretative principal that courts prefer interpretations that give independent legal effect to every word and clause in the statute." *United States v. Palomares*, 52 F.4th 640, 644 (5th Cir. 2022).

Further, the interpretation of "and" as "and thereafter" "makes no sense with respect to 'resides.'" *Pepe*, 895 F.3d at 687. It is impossible to conceive of a person residing in a foreign country and thereafter engaging in illicit sexual conduct. Instead, the inclusion of "resides" clarifies that "and" must mean "and concurrently"— "one engages in the illicit sexual conduct *while residing* in the foreign country." *Id.* 895 F.3d at 687 (emphasis in original).

Thus, § 2423(c) defines three crimes. A person can engage in illicit sexual conduct while in transit from the United States to a foreign country, while residing temporarily in a foreign country, or while residing permanently in a foreign country.

The government alleged that Muniz-Espinoza "traveled in foreign commerce," "and engaged in illicit sexual conduct," a violation of § 2423(c), Crime 1. ROA.8. The stipulated evidence at trial showed that Muniz-Espinoza engaged in illicit sexual conduct while residing temporarily at his parent's house in Ocampo. ROA.192–94. Therefore, the district court ultimately convicted Muniz-Espinoza of engaging in illicit sexual conduct while residing temporarily in Mexico. This argument matters only for the purpose of identifying the relevant statute that is subject to Muniz-Espinoza's constitutional challenge.[3]

[3] Muniz-Espinoza does not re-urge on appeal his preserved challenge to the constructive amendment of the indictment. ROA.142, ROA.90–96. Instead, as in the district court, Muniz-Espinoza raises this issue solely due to its implications for his facial and as-applied challenges to § 2423(c). ROA.142–55.

### B. Prior cases interpreting the reach of constitutional powers must be re-evaluated considering the history and tradition approach.

The job of constitutional interpretation has changed dramatically. In interpreting constitutional provisions, courts must now look to the "text, as informed by history." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 19 (2022). This interpretative approach, often referred to as "originalism," concludes that "the meaning of constitutional text is fixed at the time of its ratification and that the discoverable meaning has legal significance and is authoritative in most circumstances." *United States v. Rahimi*, 602 U.S. 680, 737 (2024) (Barrett, J., concurring).

The Supreme Court has consistently held that the originalist interpretative framework applies throughout the Constitution. *See Vidal v. Elster*, 602 U.S. 286, 290 (2024) (consulting the "history and tradition" of restricting trademarks containing names to reject a First Amendment challenge to the Lanham Act); *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 231 (2022) (holding that any right not explicitly enumerated in the Due Process Clause of the Fourteenth Amendment "must be deeply rooted in this Nation's history and tradition").

The originalist approach does not solely apply to finding the reach of enumerated rights. Instead, the Supreme Court has recently looked to "presidential immunities and privileges rooted in the constitutional tradition of the separation of powers and supported by our history" in defining the reach of Article II's presidential powers to determine under what conditions a former president could be criminally prosecuted. *Trump v. United States*, 603 U.S. 593, 611 (2024).

The degree to which courts should rely on the original meaning varies depending on how much precedent has already interpreted a given provision. When controlling precedent exists, "text and history still matter a great deal." *Rahimi*, 602 U.S. at 730 (Kavanaugh, J., concurring). And, "in relatively few cases," courts will have to "consider how the precedent squares with the Constitution's text and history," and possibly overrule that precedent. *Id.* But, even when text and history do not mandate a complete reversal of precedent, the text and history will inform "how broadly or narrowly to read a precedent" and "whether to extend, limit, or narrow a precedent." *Id.* In those cases, "the text, as well as pre-ratification and post-ratification history, may appropriately function as a gravitational pull on the Court's interpretation of precedent." *Id.*

This Court's ability to consider history also depends on the rule of orderliness. One panel of this Court "may not overturn another panel's decision, absent an intervening change in the law, such as by . . . the Supreme Court . . . ." *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 802 (5th Cir. 2021). That intervening change in the law need not be explicit. "Rather, a later panel must simply determine that a former panel's decision has fallen unequivocally out of step with some intervening change in the law." *Id.* "One situation in which this may naturally occur is where an intervening Supreme Court decision fundamentally changes the focus of the relevant analysis." *Id.*

Neither the Supreme Court nor this Court has decided a case that has direct application here. *Batson v. United States*, 580 U.S. 1182, 1184 (2017) (Thomas, J., dissenting from denial of certiorari) ("The U.S. Supreme Court has not yet articulated the extent of Congress's power under the Foreign Commerce Clause to enact laws with extraterritorial reach.") (quotes omitted). Thus, as Justice Kavanaugh instructs, the Court should focus its analysis on the text, as informed by historical tradition.

**C. Standard of Review.**

"Constitutional questions receive *de novo* review." *United States v. Connelly*, 117 F.4th 269, 273 (5th Cir. 2024).

**D. Section 2423(c), (g)(1) both facially and as-applied to Muniz-Espinoza is an unconstitutional attempt to exercise Congress's commerce power.**

The Commerce Clause provides:

> The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.

U.S. Const. art. I § 8, cl. 3.

Due to the paucity of precedent interpreting the Foreign Commerce Clause, this Court is free to interpret it based on its text, as informed by history. "Cases involving the reach of the Foreign Commerce Clause vis-a-vis congressional authority to regulate our citizens' conduct abroad are few and far between." *United States v. Clark*, 435 F.3d 1100, 1102 (9th Cir. 2006); *see also* Anthony J. Colangelo, *The Foreign Commerce Clause*, 96 Va. L. Rev. 949, 950 (2010) ("[U]nlike its Article I, Section 8 sibling, the Interstate Commerce Clause, which has been scrutinized by generations of lawyers, scholars, and judges, the Foreign Commerce Clause has received little sustained analytical attention.")..

Short though the clause may be, understanding its reach and the regulation it authorizes requires understanding its distinct parts: the power it grants and its reach. The clause grants Congress the "power to regulate" numerous things, one of which is "commerce with foreign nations."

1. *The framers did not understand the Foreign Commerce Clause to reach the regulation of noncommercial acts occurring inside a foreign country.*

The reach of the foreign commerce clause requires analysis of two distinct textual issues: (1) what qualifies as "commerce" and (2) what qualifies as commerce "with foreign nations."

a. *The original understanding of "commerce."*

Though the text of the Commerce Clause quickly diverges into three clauses, it is starts with one word, "commerce." The choice to use "commerce" once indicates that it has the same meaning throughout the three clauses. *District of Columbia v. Heller*, 554 U.S. 570, 587 (2008) (cautioning against reading a word, used once, as having "two different meanings at once"); *see also Gibbons v. Ogden*, 22 U.S. 1, 194 (1824) ("[C]ommerce, as the word is used in the constitution, is a unit . . . [and] it must carry the same meaning throughout the sentence, and remain a unit, unless there be some plain intelligible cause which alters it.").

In *Lopez*, Justice Thomas explored the original meaning of "commerce" in his concurrence. 514 U.S. at 584–602 (Thomas, J., concurring). When "the original Constitution was ratified, 'commerce' consisted of selling, buying, and bartering as well as transporting for these purposes." *Id* at 585-86 (citing 1 S. Johnson, A Dictionary of the English Language 361 (4th 3d. 1773) and others). An exhaustive review of founding-era source led Justice Thomas to conclude, that at the founding "[t]here was no question that activities wholly separated from business . . . were beyond the reach of the commerce power." *Id*. at 599.

*b. The original understanding of when commerce is "with foreign nations."*

The decision to use the word "with," instead of "among," indicates that the framers understood the power to regulate commerce between the United States (or one of the States) and a foreign nation, but not activities internal to a foreign nation or between two foreign nations.

In the Interstate Commerce Clause, the framers chose to describe Congress's authority to regulate commerce "among the States." "The word 'among' means intermingled with. A thing which is among others, is intermingled with them. Commerce among

States, cannot stop at the external boundary line of each State, but may be introduced into the interior." *Gibbons*, 22 U.S. at 194. The use of the comprehensive word "among," however, still requires that the regulation pertain to "commerce which concerns more States than one." *Id.* at 195. Thus, Congress is free to create "comprehensive legislation" that "ensnares some purely intrastate activity" when it seeks "to regulate the interstate market in a fungible commodity." *Gonzales v. Raich*, 545 U.S. 1, 24 (2005).

The framers' choice to use "with foreign Nations," instead of "among foreign Nations," reflects a deliberate choice to narrow the activities that could be regulated—consistent with the framers' understanding of and respect for the law of nations.

"The phrase '[c]ommerce with foreign [n]ations' almost identically mirrors the phrase used in Georg Frederich von Martens's 1788 treatise summarizing 'the law of nations' from 1748–88." *United States v. Clay*, 128 F.4th 163, 191 (3d. Cir. 2025) (Porter, J., concurring) (quoting Georg Frederich von Martens, *Summary of the Law of Nations, Founded on the Treaties and Customs of the Modern Nations of Europe* 145 (William Cobbett trans., 1795)). "At the time, '[c]ommerce with foreign [n]ations' referred only to a sovereign nation's power inside its territories to regulate commerce with

foreign nations; it did not refer to a legislature's power to regulate inside sovereign nations." *Id.* Those principles, including Martens's exposition of them, strongly influenced the founders' understanding of the Foreign Commerce Clause. *See id.* (collecting sources); *see also The Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 136–37 (1812) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself.").

Thus, in *Gibbons*, though "Chief Justice Marshall did not define the word 'with,' . . . he explained that it means Congress's foreign-commerce power also extends inside 'the jurisdictional lines of the several states.'" *Clay*, 128 F.4th at 191 (Porter, J., concurring) (quoting *Gibbons*, 22 U.S. (9 Wheat.) at 195). Otherwise, "the foreign-commerce power 'would be a very useless power, if it could not pass those lines. *Id.* (quoting *Gibbons*, 22 U.S. (9 Wheat.) at 195). But, Chief Justice Marshall did not address "whether Congress's foreign-commerce power extends inside the jurisdictional lines of sovereign nations" "because he did not understand Congress to have that power." *Id.*

Chief Justice Marshall's writing on the Interstate Commerce Clause provides further support for a narrower understanding of

the Foreign Commerce Clause. Interpreting the Interstate Commerce Clause, Marshall wrote, "[t]he enumeration" of the power to regulate commerce among the states "presupposes something not enumerated." *Gibbons*, 22 U.S. at 195. Similarly, "[t]he text of the Foreign Commerce Clause also presupposed something not enumerated: . . . the exclusion of commerce internal to foreign nations and commerce 'among foreign Nations' unconnected to the United States. The Foreign Commerce Clause, in other words, specifically does *not* grant Congress a global regulatory power over foreign commerce." Colangelo, *supra*, at 985–88.

Understanding the Foreign Commerce Clause as permitting regulations of commerce beginning inside the States but not reaching inside foreign nations is consistent with the writing of "Edmund Randolph—who 'drafted the initial version of the commerce clause.'" *Clay*, 128 F.4th at 189 (Porter, J., concurring) (quoting Christopher R. Green, *Tribes, Nations, States: Our Three Commerce Powers*, 127 Penn St. L. Rev. 643, 655 (2023). Randolph explained that the "heads of the power to regulate commerce with foreign nations" includes four powers:

1. [The power] to prohibit them [foreign nations] or their commodities from our ports[;]

2. [The power] to impose duties on them where none existed before, or to increase existing Duties on them[;]
3. [The power] to subject them to any species of Custom house regulations[;] [and]
4 [The power] to grant them any exemptions or privileges which police may suggest.

Edmund Randolph, *Opinion on the Constitutionality of the Bank* (1791) in 21 The Documentary History of the First Federal Congress of the United States of American 1789–91, at 772 (Charlene Bangs Bickford ed., 2017).

Some judges have argued that founding-era definitions of "with" suggest that "Congress's power to regulate foreign commerce is more expansive than its power to regulate interstate commerce" and cite to Supreme Court opinions finding that the Indian Commerce Clause, which authorizes regulation of commerce "with Indian Tribes" gives Congress the power to regulate those tribes. *Clay*, 128 F.4th at 176. (citing *Haaland v. Brackeen*, 599 U.S. 255, 272 (2023)). But, that argument ignores the different founding-era understandings of the relationship with foreign nations and Indian Tribes, which were considered "dependent sovereigns." *United States v. Lara*, 541 U.S. 193, 203 (2004).

Instead, the better understanding is that the Foreign Commerce Clause's use of "with" is that:

> 'With' denotes two sides to the 'Commerce' in the Clause. One side is "foreign Nations," for they are mentioned explicitly, and although implicit, the other side of the 'intercourse' must be the United States. As Marshall stated in the 'seminal' commerce case, *Gibbons v. Ogden*, the words of the Foreign Commerce Clause 'comprehend every species of commercial intercourse *between the United States* and foreign nations.' . . . Put another way, the Constitution does not give Congress the power to regulate commerce 'among foreign Nations' unconnected with the United States.

Colangelo, *supra*, at 970 (quoting *Gibbons*, 22 U.S. (9 Wheat.) at 189–193) (emphasis added).

c. *Congress's power to regulate commerce with foreign nations is broader than its power to regulate commerce among the states.*

Though commerce with foreign nations is a narrower category than commerce among the states, "there is evidence that the Founders intended the foreign commerce *power* to be the greater." *Japan Line, Ltd., v. County of L.A.*, 441 U.S. 434, 448 (1979) (emphasis added). The founders would have understood the Foreign Commerce Clause to confer a greater power to the federal government than the Interstate Commerce Clause because "[f]oreign commerce is pre-eminently a matter of national concerns. 'In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified

and adequate national power.'" *Id.* at 448 (quoting *Bd. Of Trustees v. United States*, 289 U.S. 48, 59 (1933)). Therefore, "the Framers' overriding concern" was "that 'the Federal Government must speak with one voice when regulating commercial relations with foreign governments.'" *Id.* at 449 (quoting *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 285 (1976)).

The need for the United States to act with one voice was rooted in its economic relationship with other sovereigns; without a unitary voice the founders were concerned that "the United States would be both an unattractive international commercial partner and a weak player on the world stage. It would be unattractive because the federal government could not effectively make agreements with foreign nations if states could undermine those agreements by following their own commercial polices. And it would be weak because the federal government would be unable to effectively act against foreign nations for the very same reason." Colangelo, *supra*, at 963.

*Japan Line* illustrates the function of the greater Foreign Commerce power and how it differs from the Interstate Commerce power. A Japanese shipping company sued to avoid paying California's tax on property passing through the state. 41 U.S. at 437. The

Supreme Court had regularly approved a state's tax on instrumentalities of interstate commerce as long as the tax was "applied to an activity with a substantial nexus with the taxing State, [wa]s fairly apportioned, [did] not discriminate against interstate commerce, and [wa]s fairly related to the service provided by the State.'" *Id.* 444–45 (quoting *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977)).

The Supreme Court treated the California tax on foreign shippers differently because of the greater power to regulate foreign, as opposed to interstate, commerce. The Foreign Commerce power is greater because of the "need for uniformity in treating with other nations." *Id.* at 448. Thus, the Supreme Court rejected the California tax because it prevented "the Federal Government from speaking with one voice when regulating commercial relations with foreign governments." *Id.* at 451.

The Supreme Court was also concerned that the California tax would create "a substantial risk of international multiple taxation" because "neither this Court nor this Nation can ensure full apportionment when one of the taxing entities is a foreign sovereign." *Id.* at 447. In other words, the Supreme Court recognized that the Foreign Commerce Clause does not authorize the government to exert

control over affairs internal to a foreign nation. But, the Foreign Commerce Clause also gives the federal government greater power over the states to ensure that they do not frustrate the government's ability to speak with one voice in international affairs. "This reasoning would seem to devastate or, at the very least, raise serious tensions with the contrary idea that Congress has more power to regulate commerce inside foreign nations than inside the several states." Colangelo, *supra*, at 969.

At the founding, commerce—as originally understood—meant selling, buying, and bartering as well as transporting for those purposes. And, commerce "with Foreign Nations" meant commerce originating within one of the United States transacted "with" a foreign Nation. Congress's power to regulate foreign commerce, therefore, authorizes Congress to regulate something being sold to, bought from, bartered with, or shipped to another nation, but it does not authorize Congress to regulate commercial (or noncommercial) actions that occur wholly within a foreign nation.

*2. Under an original understanding of the Foreign Commerce Clause, Section 2423(c) is facially unconstitutional.*

Under an originalist understanding of the Foreign Commerce Clause, § 2423(c) is facially unconstitutional. Section 2423(c) sanctions any person who travels or resides abroad and engages in illicit sexual conduct. Regardless of whether the sexual conduct is commercial or not, Congress did not regulate something being sold to, bought from, bartered with, or shipped to another nation. Instead, it regulated activity that occurs entirely inside a foreign nation. Further, the conduct is between a U.S. citizen and someone else in a foreign nation—in no sense is it commerce with a foreign nation.

Holding to the contrary threatens to imbue the federal government with general, global police power. *Clark*, 435 F.3d at 1117 (Ferguson, J., dissenting) ("The activity regulated by 18 U.S.C. § 2423(c), illicit sexual conduct, does not in any sense of the phrase relate to commerce *with foreign nations*. Rather, § 2423(c) is a criminal statute that punishes private conduct fundamentally divorced from foreign commerce. Article I, section 8, clause 3, while giving Congress broad authority over our commercial relations with other nations, is not a grant of international police power.").

That conclusion becomes even stronger when looking to § 2423(c), (g)(1)—noncommercial illicit sexual conduct. "Based on [the Foreign Commerce Clause's text and original meaning], it appears that Congress lacks *any* power to regulate inside sovereign nations under the Foreign Commerce Clause. Accordingly, § 2423(c)—which purports to regulate a U.S. citizens' or permanent resident's noncommercial conduct inside sovereign nations—does not survive scrutiny." *Clay*, 128 F.4th at 194 (Porter, J., concurring) (emphasis original); *see also United States v. Durham*, 902 F.3d 1180, 1241 (10th Cir. 2018) (Hartz, J., dissenting) ("In my view, the Foreign Commerce Clause does not authorize Congress to prohibit noncommercial sexual assaults, no matter how heinous, committed by Americans abroad who formed the intent to commit the acts after arriving abroad.") *United States v. Rife*, 33 F.4th 838, 845 (6th Cir. 2022) ("Rife's conviction under 18 U.S.C. § 2423(c) for molesting his two victims in Cambodia, years after he travelled there, and without any commercial exchange, was not an exercise of Congress's power 'to regulate Commerce with foreign nations[.]' His conviction cannot stand on that ground."); *United States v. Bianchi*, Case No. 09–2664, 386 F. App'x 156, 163 (3d Cir. 2010) (Roth, J.,

concurring in part and dissenting in part) ("Although . . . , Congress's foreign commerce is broad, it has never been deemed unlimited. Congress may regulate activities that are commercial in nature or substantially affect foreign *commerce*. However, Title 18 U.S.C. § 2423(c), as defined in section 2423(f)(1), reaches crimes that do not in any sense constitute 'Commerce with foreign Nations.'").

Though this Court has not ruled on the constitutionality of § 2423(c), it has found 18 U.S.C. § 2423(b) a constitutional exercise of Congress's ability to regulate the channels of commerce. *Bredimus*, 352 at 201. In *Bredimus*, the defendant traveled from the United States to a foreign country and paid a "procurer and interpreter" to find children whom he could photograph and with whom he engaged in sexually explicit conduct. *Id.* at 203. The prosecution was a permissible exercise of Congress's authority "to reach and punish movement in interstate[ or foreign] commerce of those who seek to accomplish unlawful purposes." *Id.* at 205, 207.

Arguably, regulating a person's non-commercial movement through the channels of commerce falls outside of the original meaning of the foreign commerce clause's reach because the original meaning of commerce focused not on regulating people traveling

but on transporting commodities for the purpose of buying, selling, or bartering them. *Lopez*, 514 U.S. at 585–86 (Thomas, J., concurring). But, in *Bredimus* the parties assumed that the Supreme Court's interpretation of the Interstate Commerce Clause controlled the meaning of the Foreign Commerce Clause. *Id.* at 204 ("Bredimus brings a challenge under *Lopez* and *Morrison*.").[4] For the reasons articulated above, *Bruen* requires that the Court examine the historical understanding of the Foreign Commerce Clause as opposed to the jurisprudential evolution of the Interstate Commerce Clause. But, even if the Court is inclined to continue following *Bredimus*, it does not dictate the resolution of this challenge to § 2423(c).

---

[4] In *Bredimus*, the Court buttressed its analysis by citing to *Japan Line*'s statement that "Congress's authority to regulate foreign commerce is even broader than its authority to regulate interstate commerce." *Bredimus*, 352 F.3d at 208 (citing *Japan Line, Ltd.*, 441 U.S. at 448). That was dicta, unnecessary to the conclusion that the Court had already reached that § 2423(b) regulated a channel of commerce. Moreover, it is not in conflict with Muniz-Espinoza's argument. Muniz-Espinoza concedes that the "authority to regulate" in the Foreign Commerce Clause is greater than in the Interstate Commerce Clause but argues that the clauses differ in their reach.

Section 2423(c) does not regulate a channel of commerce. "[T]he Supreme Court has affirmed" channels of commerce regulations "only in cases where 'the person or thing barred from interstate commerce was tainted by either prior immoral conduct or the intent to engage in such conduct upon the completion of the journey." *Clay*, 128 F.4th at 194–95 (Porter, J., concurring) (citing *Champion v. Ames*, 188 U.S. 231 (1903) and *Hoke v. United States*, 227 U.S. 308 (1913)). Section 2423(c) does not require a person to have an unlawful intent while traveling in foreign commerce. Thus, it is not justifiable on a channels theory because "if Congress could regulate 'illicit sexual conduct' based solely on the fact that an individual had—at some previous point—crossed state line, Congress could regulate literally everything done by anyone who had ever travelled in interstate commerce." Colangelo, *supra*, at 996.

An original understanding of the Foreign Commerce Clause shows that the government has less power to regulate actions internal to a foreign country than it does internal to a state; therefore, it cannot possibly authorize the regulation created by § 2423(c), (g)(1) because no such analogous domestic regulation could be authorized. *See* Colangelo*, supra*, at 996 ("Tellingly, and unlike Section 2423(b)'s foreign travel prohibition (which is paired with an

analogous interstate travel prohibition), there is no domestic counterpart to Section 2423(c)'s extraterritorial prohibition in illicit conduct.").

### *3. Even under the Lopez framework, § 2423(c), (g)(1) is facially unconstitutional because non-commercial illicit sexual conduct, even if aggregated, cannot affect commercial sex.*

Even if the Court is inclined to look solely to the *Lopez* framework, § 2423(c), (g)(1) falls outside of the activities that can be regulated by the Commerce Clause.

Unlike the Foreign Commerce Clause, the courts have written extensively about the reach of the Interstate Commerce Clause. In *Lopez*, the Supreme Court defined the outer limits of the Interstate Commerce Clause but, in doing so, was explicit that its interpretation of the clause was unmoored from its original meaning. 514 U.S. at 554. From the founding until the early 20th century, courts understood the commerce power as limited; "commerce" was distinct from manufacture, mining, and production. *Id.* As late as 1935, "[a]ctivities that affected interstate commerce directly were within Congress' power; while activities that affected interstate

commerce indirectly were beyond Congress' reach." *Id.* at 555 (citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 550 (1935)).

But, two years later, a series of three cases "ushered in an era of Commerce Clause jurisprudence that greatly expanded the previously defined authority of Congress under that Clause." *Id.* at 556. Those changes reflected both that formerly local businesses had expanded to "become national in scope" but also a view that the original understanding of the Commerce clause "artificially had constrained the authority of Congress to regulate interstate commerce." *Id.*

The Supreme Court did not seek to reverse those changes in *Lopez* but, instead, to define the "outer limits" of that "era of Commerce Clause jurisprudence." *Id.* at 553-59. Those outer limits were activities that fell into one of three classes: (1) channels of interstate commerce, (2) instrumentalities of interstate commerce, or, (3) activities that substantially affect interstate commerce.

"First, Congress may regulate the use of the channels of interstate commerce." *Lopez*, 514 U.S. at 558. "This category includes the regulation of highways, railroads, air routes, navigable rivers, and telecommunications networks . . . [and] the misuse of [those]

channels . . . . For example, within this category Congress has regulated the interstate transport or shipment of stolen goods, 18 U.S.C. § 2314, kidnapped persons, 18 U.S.C § 1201, prostitutes, 18 U.S.C. § 2421, and illegal lottery tickets." *Ho*, 311 F.3d at 597.

"Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, even though the threat may come only from intrastate activities." *Lopez*, 311 F.3d at 558. The "instrumentalities" are the means of interstate commerce, like ships and railroads, as well as the "person or things in interstate commerce." *Lopez*, 514 U.S. at 558.

Third, "Congress's commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e. those activities that substantially affect interstate commerce." *Id.*

As argued in the preceding section, § 2423(c) does not regulate a channel or instrumentality of foreign commerce; thus, the remaining question is whether it regulates an activity that substantially affects interstate commerce.

In determining whether certain acts "substantially affect foreign commerce," the courts consider four factors. First, the Su-

preme Court has instructed that "[w]here economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *United States v. Morrison*, 529 U.S. 598, 610 (2000). In *Lopez*, "the noneconomic, criminal nature of the conduct at issue was central to" the Supreme Court's decision to strike down a federal law punishing possession of a gun in a school zone. *Id.* (citing *Lopez*, 514 U.S. at 551). Second, the Supreme Court considers whether "the statute contain[s] [an] express jurisdictional element which might limit its reach to a discrete set of" acts that "have an explicit connection with or effect on interstate commerce." *Id.* at 611–12. Third, the Supreme Court considers any "express congressional findings regarding the effects upon interstate commerce of" the regulated acts because "the existence of such findings may enable [courts] to evaluate the legislative judgment that the activity in question substantially affects interstate commerce, even though no such substantial effect is visible to the naked eye." *Id.* at 612. Finally, the Supreme Court will consider whether the link the government attempts to draw between the regulated activity and its effect on interstate commerce is "attenuated" or direct. *Id.* 612.

The Supreme Court has applied this test in a variety of contexts. The Supreme Court has found that Congress exceeded its ability to regulate commerce both by passing a law making it illegal to possess a firearm in a school zone, *Lopez*, 514 U.S. at 551, and by passing a law giving victims of gender-motivated violence a civil remedy against their attackers, *Morrison*, 529 U.S. at 601. In both cases, the court relied heavily on the fact that the regulated activity "ha[d] nothing to do with 'commerce' or any sort of economic enterprise." *Lopez*, 514 U.S. at 561; *see also Morrison*, 529 U.S. at 613 ("Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity."). Both statutes also lacked a "jurisdiction element which would ensure, through case-by-case inquiry, that the [regulated activity] affects interstate commerce." *Lopez*, 514 U.S. at 561; *Morrison*, 529 U.S. at 613. Finally, the government's claims that gun possession in a school zone affected the national economy through resulting violent crime, *Lopez*, 514 U.S. at 563, and that gender-motivated violence also affected the national economy, *Morrison*, 529 U.S. at 615, both relied on an unacceptable line of reasoning that would permit Congress to "regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id*. at 617.

Here, as in *Lopez* and *Morrison*, noncommercial illicit sexual conduct has nothing to do with commerce or any sort of economic enterprise. Further, § 2423(c), at least with respect to illicit sexual conduct that occurs exclusively inside a foreign country contains no jurisdictional element ensuring that illicit sexual conduct affects interstate commerce.[5] And, while Congress did make factual findings about the global marketplace for sexual exploitation of children, in which children are trafficked across borders for the purpose of prostitution, pornography production, and other forms of sexual abuse, Congress did not make any findings that noncommercial illicit sexual conduct, when aggregated, somehow effects that market. *See* H.R. Rep. No. 108–66, at 51–52 (2003) (Cong. Rep.); H.R. Rep. No. 107–525, at 2–3 (2002); *see also United States v. Al-Maliki*, 787 F.3d 784, 793 (6th Cir. 2015) (finding that

[5] Only § 2423(c), Crime 1 contains a jurisdictional element that is loosely associated with the criminal activity and, a "jurisdictional element alone is not sufficient" to show a constitutional exercise of Congress's power. *United States v. Kallestad*, 236 F.3d 225, 229 (5th Cir. 2000). Further, if Muniz-Espinoza's interpretation of Crime 1, that the sexual conduct must occur within a channel of commerce, is rejected, then the "statute's jurisdictional element is only tenuously related to the ultimate activity regulated, [meaning] there can be no assurance that the regulated activity affects interstate commerce." *Bianchi*, 386 F. App's at 164.

"Congress included neither a jurisdictional statement nor a constitutional authority statement in passing this subpart.").

Rejecting § 2423(c)'s sanction of purely local criminal conduct is necessary to "preserve one of the few principles that has been consistent since the [Commerce] Clase was adopted. The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *Morrison*, 529 U.S. at 618.

Because § 2423(c) sanctions noncommercial conduct, not the production of a commodity, it similarly cannot be justified as part of a larger regulatory regime. In *Gonzales v. Raich*, 545 U.S. 1 (2005), the Supreme Court addressed the constitutionality of the Comprehensive Drug Abuse Prevention and Control Act of 1970 as applied to homegrown marijuana. The Supreme Court held that the CSA fell within Congress's ability to regulate noncommercial, intrastate production of a commodity if failure to regulate "would undercut the regulation of the interstate market in that commodity." *Id*. at 18.

The fact that the activity at issue was the production of a commodity was critical. Congress could regulate the noncommercial,

intrastate production of marijuana for home consumption because such regulation was necessary to mitigate against "the likelihood that the high demand in the interstate market will draw such marijuana into that market." *Id*. at 19. Because Congress had a "rational basis" for concluding that the home growers' "activities, taken in the aggregate, substantially affect[ed] interstate commerce," Congress acted within its authority to make all laws necessary and proper to regulate ecommerce among the several states. *Id*. at 22.

After *Raich*, what the Supreme Court said in *Morrison* remains true: "thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." *Morrison*, 529 U.S. at 613. Noncommercial illicit sexual conduct is not economic in nature. Nor can it, when aggregated, have a substantial effect on interstate commerce.

Nonetheless, some Courts have held that § 2423(c), (g)(1) can be regulated pursuant to Congress' ability "to regulate activities that demonstrably affect such commerce." *See, e.g., United States v. Bollinger*, 798 F.3d 201, 216, 218 (4th Cir. 2015). The flaw in that reasoning is readily available from a close reading:

> As previously discussed, Congress may also regulate an activity when it is rational to conclude that *the activity has a demonstrable effect* on foreign commerce. It is eminently rational to believe that *prohibiting* the non-commercial sexual abuse of children by Americans abroad *has a demonstrable effect* on sex tourism and the commercial sex industry.

*Id.* at 218 (emphasis added). As the Fourth Circuit's opinion makes clear, it is the prohibition that has an arguably demonstrable effect—not the activity. In that way, the regulation fails the *Raich* test.

Perhaps, the Fourth Circuit was correct that "prohibiting the non-commercial sexual abuse of children by Americans abroad has a demonstrable effect on sex tourism and the commercial sex industry." *Bollinger*, 798 F.3d at 218. But, just as clearly as the Fourth Circuit's phrasing shows that it is the regulation, not the regulated activity, that effects commerce. Further, it shows that the goals of the regulation are too attenuated from the regulated activity to survive Commerce Clause scrutiny. In *Morrison*, the Supreme Court considered compelling evidence that gender-based violence had economic impacts and that eliminating, or sanctioning, it would benefit the economy. 529 U.S. at 615. But, the Su-

preme Court rejected that reasoning because it "would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects" on the economy. *Id.*

Further, even if non-commercial sex is an economic activity that, in the aggregate, affects interstate or foreign commerce, section 2423(c) is not part of a "comprehensive regulatory regime." *Raich*, 545 U.S. at 27. Instead, 18 U.S.C. Chapter 117 serves to arbitrarily punish only some people who engage in illicit sexual conduct. Most glaringly, a person who travels in *interstate* commerce and engages in illicit sexual conduct cannot be convicted under 18 U.S.C. § 2423(c).[6] Thus, § 2423 omits large swaths of offenders from the needed "holistic approach." *Bollinger*, 798 F.3d at 218.

The reason Section 2423 omits a "domestic counterpart to Section 2423(c)" is both rooted in Commerce Clause jurisprudence and illustrates why § 2423(c) exceeds the powers enumerated in that clause. "[I]f Congress could regulate 'illicit sexual conduct'

[6] Section 2423(c) also only applies to "United States citizen[s] or alien[s] admitted for permanent residence" who engage in illicit sexual conduct in foreign countries, omitting from the comprehensive regulation all non-U.S. citizens and permanent residents who engage in illicit sexual conduct.

based solely on the fact that an individual had—at some previous point—crossed state lines, Congress could regulate literally everything done by anyone who had ever traveled in interstate commerce. . . . In the domestic context, such a comprehensive regulatory power over the vast majority of people in the United States would threaten to unconstitutionally 'obliterate the distinction between what is national and what is local and create a completely centralized government.'" Colangelo, *supra*, at 996 (quoting *Lopez*, 514 U.S. at 557); *see Al-Maliki*, 787 F.3d at 793 ("There isn't—and can't be—a generalized federal crime for traveling in interstate commerce with no illicit purpose and then, after a few months, committing illicit sexual conduct with a minor.")

Because § 2423(c), (g)(1) does not regulate a commodity and is not part of a comprehensive regulatory regime, § 2423(c), (g)(1) does not regulate an activity that substantially affects foreign commerce. Thus, even if the Court is inclined to interpret the bounds of the Foreign Commerce Clause in the same way it interprets the bounds of the Interstate Commerce Clause, § 2423(c), (g)(1) is facially unconstitutional because none of its applications are authorized by Congress's ability to regulate foreign commerce.

### D. The power to make all laws necessary and proper to making treaties does not provide Congress with the power to enact Section 2423(c), (g)(1).

The government may also argue, consistent with the holdings of some courts of appeals, that § 2423(c), (g)(1) is a necessary and proper means of implementing a treaty, The Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution and Child Pornography, 2171 U.N.T.S. 227 (May 25, 2000)("Optional Protocol"), a non-self-executing treaty to which the United States is a party.

The Constitution gives the President the power "to make Treaties, provided two thirds of the Senators present concur . . . ." U.S. Const. art. II, sec. 2, cl. 2. Once a treaty is ratified by the Senate, it becomes federal law if "it operates of itself without the aid of any legislative provision," in other words, when the treaty is "self-executing." *Medellin v. Texas*, 552 U.S. 491, 505 (2008). But, non-self-executing treaties do not create federal law "unless Congress has . . . enacted implementing statutes." *Id.*

The Constitution also gives the Congress the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers and all other Powers vested by this Constitution in the Government of the United States . . . ." U.S.

Const. art. I, § 8, cl. 18. Read together, the treaty power and the necessary and proper clause empower Congress to pass laws necessary and proper for carrying into execution the power to make treaties.

From these two powers and the Optional Protocol, some courts have found an independent authorization for § 2423(c). *See, e.g.*, *Rife*, 33 F.4th at 848 (holding that because the Optional Protocol was a valid treaty and that § 2423(c) was rationally related to the treaty's provisions, § 2423(c) was constitutional as applied to non-commercial sex offenses against children).

Those decisions suffer from two problems: first, they read *Missouri v. Holland*, 252 U.S. 416 (1920), too broadly—as authorizing any congressional act rationally related to the aims of a previously-enacted treaty; second, they uncritically accept that laws against any illicit sexual conduct are necessary and proper to the implementation of the Optional Protocol.

1. *Holland requires a meaningful inquiry into whether legislation is necessary to the implementation of a treaty and a proper means of achieving the treaty's goals.*

In *Holland*, the Supreme Court concluded that Congress had authority, under the Necessary and Proper Clause, to pass legislation that implemented a non-self-executing treaty. 252 U.S. at 434–

35. *Holland* involved Missouri's challenge to the federal government's attempt to enforce the Migratory Bird Treaty Act. *Id.* at 430–31. Missouri argued that the Act was unconstitutional because it gave to the government a right reserved to the States by the Tenth Amendment. *Id.* (citing U.S. Const. amend. X).

There was no question in *Holland* whether the statute was implementing legislation because the statute was "entitled an act to give effect to the convention;" it was called the Migratory Bird Treaty Act. *Id.* at 431. Instead, the Supreme Court only addressed whether the statute was a necessary and proper remedy to the harm the treaty had identified. *Id.* at 432.

The Supreme Court found that the statute was necessary because the treaty spoke to "a national interest of very near the first magnitude . . . . It can be protected only by national action in concert with that of another power. . . . But for the treaty and the statute there soon might be no birds for any powers to deal with." *Id.* at 435. Also, the Supreme Court considered the statute proper because "the treaty in question does not contravene any prohibitory words to be found in the Constitution," namely the Tenth Amendment. *Id.* at 433; *see also id.* at 432 ("We do not mean to imply that there are no qualifications on the treaty-making power."); *Boos v. Barry*, 485

U.S. 312, 324 (1988) (It is "well established that no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution.").

Some courts have seized on dicta in *Holland* where the Court wrote, "If the treaty is valid there can be no dispute about the validity of the statute under Article 1, Section 8, as a necessary and proper means to execute the powers of the Government." 252 U.S. at 432. But, those courts read *Holland* too broadly:

> First, *Holland* does not speak to how to determine whether Congress has enacted a piece of legislation to implement a non-self-executing treaty, let alone direct the lower federal courts to apply the Necessary and Proper Clause's 'rational relationship' test to make that determination. . . . Second, *Holland* does not stand for the proposition that every piece of implementing legislation is constitutional so long as the treaty it implements is valid. If that were the case, then the Court would have had no reason to address the facts of the case before it except to say that the Migratory Bird Treaty Act of 1918 was constitutional because it implemented a valid treaty between Gret Britain and the United States.

*United States v. Reed*, Case No. 15-188, 2017 WL 3208458, at *15 (D.D.C. Jul, 27, 2017). Thus, more than showing a mere rational relationship, § 2423(c) "is 'necessary' to the implementation of the

Optional Protocol if it is 'plainly adapted to' the treaty, and the statute is a 'proper' means of doing so if it is both 'not prohibited' by the Constitution and 'consistent with the letter and spirit of the Constitution.'" *Id.* (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819)).

2. *Section 2423(c), (g)(1) is neither properly considered implementing legislation nor a necessary or proper method of executing the Optional Protocol.*

The Optional Protocol calls on "State Parties" to create and enforce laws that prohibit the exploitation of children for commercial gain. The States Parties' obligations are "to prohibit the sale of children, child prostitution and child pornography." Optional Protocol art. 1. The terms of the treaty focus on the commercial market for the child abuse and omit any requirement for the State Parties to eliminate all sexual conduct with children.

a. *Section 2423(c) is not an implementing statute.*

The power to do what is necessary and proper to carry into execution the Optional Protocol does not expand Congress's powers to pass § 2423(c) where it could not otherwise.

First, Congress did not label § 2423(c) an implementation of the Optional Protocol. § 2423(c), originally and as amended, contains no indication that it implements the Optional Protocol. *Cf. Holland*,

252 U.S. at 430 (considering a statute explicitly named "the Migratory Bird Treaty Act"). By contrast, Congress passed § 2423(c) expressly by invoking its power to regulate foreign commerce. *See* H.R. Rep. No. 107-252, at 2–5 (2002) (referring to travel in foreign commerce as authority for the legislation); H.R. Conf. Rep. No. 106–66 (2003), at 51–52, 2003 U.S.C.C.A.N. 683, 686 (making no mention of the Optional Protocol or treaty power but rather only the government's "problem" meeting the standard of proof); H.R. Rep. 107–525 (2002) (omitting any mention of the treaty power and instead explaining that eliminating the intent requirement would help "close significant loopholes in the law that persons who *travel to foreign countries seeking sex with children* are currently using to their advantage in order to avoid prosecution" (emphasis added)).

Notably, federal law prohibited child prostitution and travel in foreign commerce with the intent to engage in a sexual act with a child as early as September 1994, long before the Senate ratified the Protocol in 2002. *See* Violent Crime Control & Enforcement Act of 1994, Pub. L. No. 103-122, Title CVI, § 160001(g) (1994) (codified at 18 U.S.C. § 2423(a)–(b)). Consequently, the analysis included with the Protocol's submission to the Senate recognized that spe-

cific criminal acts identified in the Protocol were already "fully covered" by United States law. S. Treaty Doc. No. 106–37 (July 5, 2000), 2000 WL 33366017, at *14–*15 ("Optional Protocol Analysis").

Specifically, the analysis states that the criminal acts targeted by the treaty already "violate[d] criminal statutes under existing U.S. federal and state laws." *Id.* at *15. The analysis expressly referred to § 2423, and specifically to § 2423(b), which prohibits "travel with intent to engage in any sexual act with one under age 18." *Id.* at *18.

Further, the Optional Protocol Analysis accompanying the treaty's transmittal to the Senate identified the limits of United States law to reach offenses committed by the U.S. citizens where the crime has no additional nexus to the United States. It cautioned that "U.S. extraterritorial jurisdiction based on nationality of the offender does not reach all offenses set forth in the Protocol." *Optional Protocol Analysis*, 2000 WL 33366018, at *23. "Nonetheless," it explained, "since Article 4(2) is permissive rather than obligatory, U.S. law is consistent with the requirement of the provision" of the Optional Protocol that "provides that each State party may, but is

not obligated to, establish jurisdiction when [ ] the alleged offender is a national of that State[.]" *Id.* at *21, *23 (citing Article 4(2)(a)).

Thus, nothing in § 2423(c) or its history either identifies or tracks the treaty.

*b. Even if Section 2423(c) could be considered implementing legislation, it is neither necessary nor proper.*

Section 2423(c) is not plainly adapted to the Optional Protocol and the means chosen—criminalizing noneconomic illicit sexual conduct abroad—is inconsistent with other constitutional provisions.

The focus of the Optional Protocol is explicitly on the economic exploitation of children. There is no mention of the sort of disparity in age sexual crimes at issue in § 2423(c), (g)(1). Indeed, the opposite, the Optional Protocol Analysis specifically clarifies, "[s]ince the Protocol aims at punishing sexual abuse in the context of the *sale of a child*, there is no obligation [under the Optional Protocol] to criminalize consensual conduct involving individuals under age 18 that is legal under the laws of a State Party." *Optional Protocol Analysis*, 2000 WL 33366017, at *15 (emphasis added).

Some courts have described § 2423(c) as necessary because it closes a "loophole in the law" that "could encourage American sex

tourists . . . to go abroad seeking *non*-commercial sex with minors that . . . would be criminalized as statutory rape" in the United States. *United States v. Park*, 938 F.3d 354, 368 (D.C. Cir. 2019). Such non-commercial sex would not be criminalized by the federal government because it would violate the Interstate Commerce Clause; instead, it would be punished, as it is abroad, by the local authority. More important, the situation envisioned in *Park* is simply not a loophole that § 2423(c) closes. 18 U.S.C. § 2423(b) sanctions "a United States citizen . . . who travels in foreign commerce, with intent to engage in any illicit sexual conduct." That would include a sex tourist who goes abroad seeking non-commercial sex.

In *Holland*, the implementing legislation was necessary to "a national interest of very nearly the first magnitude," and the actions it took—to ensure the preservation of the nation's "food supply"—could be accomplished "*only* by national action in concert with that of another power." 252 U.S. at 435 (emphasis added). There is simply not any evidence to support that § 2423(c) is so necessary to the ends of the treaty that it justifies a similar expansion of the federal government's enumerated powers. *See Reed*, 2017 WL 3208458, at *17 ("[T]he prosecution of individual American citizens

residing abroad who molest children without remuneration is a matter that can be handled entirely by local law enforcement.").

Not only is § 2423(c) insufficiently necessary to the power to effect the Optional Protocol, it is also improper. Critical to the holding in *Holland* was that the statute did "not contravene any prohibitory words to be found in the Constitution;" there was only a suggestion that it was "forbidden by some invisible radiation from the general terms of the Tenth Amendment." *Holland*, 252 U.S. at 383–84. Here, however, some courts have relied exclusively on the power to execute treaties as the authorization for § 2423(c), despite the absence of any other source of authorization for a government of limited, enumerated powers. *See, e.g. Rife*, 33 F.4th at 848 (upholding § 2423(c) under the treaty power though it was an unconstitutional extension of the foreign commerce power). § 2423(c) exceeds any of the enumerated powers given to Congress because it regulates non-economic activity. § 2423(c) is, therefore, an improper implementation of a treaty that does not require it.

Also improper is the suggestion that Congress can broaden its powers by implementing laws that are related to the same subject as a treaty but not required by the treaty. In *Park*, the D.C. Circuit

stressed that the Optional Protocol required State Parties to sanction the commercial market for child sex "as a minimum" and, thereby created "a floor, not a ceiling." 938 F.3d at 414–15. But, that conception of Congress's powers contradicts the Constitution's vision of a government of limited, enumerated power. To the extent that the treaty power can be said to give the President and the Senate enumerated powers not already conferred by the Constitution, those powers must at least be limited by the mandates of the treaty—making the treaty a ceiling, not a floor.

Further, the expansive view of the treaty power adopted by the Sixth and D.C. Circuits would obliterate previously enforced limits on the power of the federal government. For example, in 1980, the United States became a signatory to the Convention on the Elimination of All Forms of Discrimination against Women (July 17, 1980) 1249 U.N.T.S. 13. In *Morrison*, the Supreme Court rejected an attempt by Congress to give a federal civil remedy to victims of gender-motivated violence because the logic justifying it would "completely obliterate the Constitution's distinction between national and local authority." 529 U.S. at 615. Certainly, such a civil remedy would be rationally related to implementing a treaty seeking to eliminate all forms of discrimination against women. Thus,

the expansive view of the treaty power would permit the Senate to similarly obliterate that extinction by ratifying a treaty. Surely these important limits that the founders imposed on the federal government cannot be so easily undone.

Indeed, multiple Supreme Court justices have found the broad treaty power at odds with the text of the Constitution and the intention of the founders. In *Bond v. United States*, Justice Scalia, joined by Justice Thomas, rejected the "*ipse dixit*" writing in *Holland* that "'there can be no dispute about the validity of the statute under Article I, § 8, as a necessary and proper means to execute the powers of the Government.'" 527 U.S. at 873–74 (Scalia, J., concurring) (quoting *Holland*, 252 U.S. at 432). Reading the Necessary and Proper and the Treaty clauses together, Justice Scalia wrote that they "do not authorize Congress to enact laws for carrying into execution 'Treaties,' even treaties that do not execute themselves." *Id.* at 875. "[A] power to help the President *make* treaties is not a power to *implement* treaties already made. Once a treaty has been made, Congress's power to do what is 'necessary and proper' to assist the making of treaties drops out of the picture." *Id.* at 876.

Because the expansive view of the treaty power adopted by some courts is at odds with the text of the Treaty power, under the interpretive framework adopted in *Bruen*, this Court should resist extending *Holland*. *Rahimi*, 602 U.S. at 730 (Kavanaugh, J., concurring) (counseling courts to look to "text and history" "when determining whether to extend, limit, or narrow a precedent").

Allowing the Optional Proctol to confer on Congress a power that would otherwise be denied would transform the scope of the treaty power to reach a matter of domestic concern—the purely local, noncommercial sexual abuse of a minor. *See Bond*, 572 U.S. at 894 (Thomas, J., concurring) ("Nothing in our cases . . . suggests that the Treaty Power conceals a police power over domestic affairs.").

**E. Even if some applications of § 2423(c), (g)(1) are constitutional, its application here—to noncommercial, intrafamilial abuse that occurred outside the channels of commerce—exceeded the government's constitutional powers.**

Each of the arguments that § 2423(c), (g)(1) is facially unconstitutional are stronger as-applied to Muniz-Espinoza's specific conduct.

Both sets of arguments for the constitutionality of § 2423(c), (g)(1)—under the Foreign Commerce and combined Necessary and Proper with Treaty Clauses—reduce to simple propositions: criminalizing noncommercial sex abroad is necessary to combat commercial child sex tourism because proving both the commercial aspect of child sex and desire to engage in child sex prior to travel are too difficult.

In this case, the evidence at trial was stipulated to by both parties and offered by the government. In short, there was no risk here that Muniz-Espinoza's conduct furthered the commercial sex market and the parties agreed the conduct was not pre-planned. Instead, the parties agreed that he did not expect to encounter his relative when he traveled from the United States to Mexico. ROA.193. He did not travel with a plan to engage in the illicit sexual conduct, "it was a spur-of-the-moment decision." ROA.193. And, he was not in any channel of commerce when the sexual conduct occurred; rather, it occurred while Muniz-Espinoza was "staying at [his] parents' house, the day after [he] arrived." ROA.193.

Further, the stipulations show conclusively that Muniz-Espinoza's conduct was not commercial. The parties agreed that Muniz-Espinoza "did not give anything of value" to his relative "or

promise to do anything for [her] in exchange for her participation in the sexual contact." ROA.193.

"A facial constitutional challenge is the 'most difficult challenge to mount successfully, because it requires a defendant to establish that no set of circumstances exists under which the Act would be valid.'" *Connelly*, 117 F.4th at 281 (quoting *Rahimi*, 602 U.S. at 693. For the Court to hold that a statue is facially unconstitutional, Muniz-Espinoza bears the heavy burden of demonstrating that "no set of circumstances exist under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). In contrast to succeed on an as-applied challenge, Muniz-Espinoza need only show that the statute is an unconstitutional exercise of congressional power as applied to his conduct.

In *Connelly*, this Court looked to the underlying facts when the defendant was charged with possession of a firearm while intoxicated to determine whether 18 U.S.C. § 922(g)(3) was constitutional as-applied to her. 117 F.4th 268, 282 (5th Cir. 20204). The Court found that the evidence showed Connelly would partake of marijuana to help with sleep and anxiety but there was no evidence show was intoxicated while carrying a firearm—only that she used mari-

juana while constructively possessing a firearm. *Id.* This Court interpreted the Second Amendment to permit only bans on carrying firearms while actively intoxicated. *Id.* at 281. The Court concluded that sweeping Connelly into that ban violated the Second Amendment as understood by the founders. *Id.* at 282.

Here, Muniz-Espinoza similarly urges the Court to look to the stipulated evidence to conclude that the Constitution, as originally understood, does permit the government to sanction his noncommercial conduct in Mexico.

1. *Congress's power to regulate commerce with foreign nations did not justify its regulation of Muniz-Espinoza's non-commercial, intrafamilial illicit sexual conduct.*

Regardless of the interpretation of the Foreign Commerce Clause that the Court adopts, Muniz-Espinoza's conduct was decidedly divorced from foreign commerce.

Regardless of how the Court interprets the Foreign Commerce Clause, Muniz-Espinoza's conduct shows that he is in a class of § 2423(c) violators particularly removed from foreign commerce

"None of the *Lopez* factors support the conclusion that residing in a foreign country and molesting one's own [family member] has a substantial effect on the international market for child trafficking and sex tourism." *Reed*, 2017 WL 3208458, at *12. First, a "sexual

act," . . . involves the touching of certain parts of the defendant's body against certain parts of the victim's body. 18 U.S.C. § 2246(2), 2423(g)(1). Thus, the act is not economic in nature but instead is "noneconomic, violent criminal conduct." *See Morrison*, 529 U.S. at 610–11; *Lopez*, 514 U.S. at 561 (possessing a firearm in a school zone has nothing "to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms").

Second, Muniz-Espinoza's specific conduct eliminates the already weak "jurisdictional element" connection between § 2423(c) and foreign commerce. Muniz-Espinoza had exited the channels of commerce and was staying in Mexico when he molested his relative. "Residency in a foreign country alone does not offer a jurisdictional element that allows the courts to 'ensure, through case-by-case inquiry, that the [sexual abuse in question] affects [foreign] commerce.'" *Reed*, 2017 WL 3208458, at *12 (quoting *Lopez*, 514 U.S. at 561) (alterations original).

Third, § 2423(c)'s legislative history "made no factual findings showing that *noncommercial* sexual violence committed by Americans residing abroad against children, generally, or biologically related children, in particular, has a substantial effect on foreign commerce." *Id* (emphasis original); *see also Al-Maliki*, 787 F.3d at 793

(discussing the absence of legislative findings and noting that "Congress' failure to even try to show the aggregate effect of noncommercial sexual activity on foreign commerce highlights its lack of power here").

Fourth, the government cannot credibly claim that "an American citizen's act of sexually abusing [a relative] . . . is 'an essential part' of Congress' broader efforts to stamp out American citizens' participation in the international market for child trafficking and sex tourism, such that it is 'necessary and proper' for Congress to regulate that activity." *Reed*, 2017 WL 3208458, at *13.

The Courts that have found § 2423(c) constitutional have often pointed to the difficulty that "[p]rosecutors sometimes ha[ve in] proving" that a defendant who was traveling in foreign commerce intended to engage in illicit sexual conduct. *Clay*, 128 F.4th at 172; *see also Park*, 938 F.3d at 368. In short, the argument is essentially: it's difficult to prove that some cases fall within the commerce power. The idea that Congress can expand its power to regulate noncommercial activity because it is difficult to prove the jurisdictional element risks "obliterat[ing] the distinction between what is national and what is local." *Lopez*, 514 U.S. at 567. Congress regulates an array of criminal activity when the nature of the activity

takes on an interstate or commercial nature. The logic of *Clay* and *Park* would seem to permit Congress to pass a federal assault statute without a jurisdictional element if it simply found a compelling need to eliminate the crime and a difficulty of proving the jurisdictional element.

Muniz-Espinoza engaged in illicit sexual conduct with his relative. That illicit sexual conduct did not occur within a channel of commerce, nor did the conduct itself, or if aggregated, substantially affect the international market for child trafficking and sex tourism. "[T]here simply is no nexus between the act of an American citizen molesting . . . his [relative], without the exchange of anything of value to or from any person, while residing in [Mexico], and the market for child trafficking and sex tourism." *Reed*, 2017 WL 3208458, at *13.

2. *Congress's treaty power does not justify its regulation of Muniz-Espinoza's non-commercial, intrafamilial illicit sexual conduct.*

Implementing the Optional Protocol—which calls for the elimination of the sale of children, child prostitution and child pornography—does not require penalizing noncommercial illicit sexual conduct. Those same arguments apply with even greater force when

the parties agrees that the conduct was noncommercial and the intrafamilial context of the abuse contradicts any concern of undetected commerce.

"Section 2423(c)'s criminalization of noncommercial sexual abuse of one's own [relative] by an American residing in a foreign country is not 'necessary' because the conduct it prohibits is not plainly adapted to implement the stated goals of the Optional Protocol and does not require multiple nation's involvement to prevent." *Reed*, 2017 WL 3208458, at *17. For the same reasons that prosecuting Muniz-Espinoza will not substantially affect commerce, it also will do nothing to obtain the ends of the Optional Protocol. "Prosecuting an American residing abroad who molests his own [relative] for no commercial purpose brings the State Parties to the Optional Protocol no closer to eliminating the market in child trafficking and sex tourism." *Reed*, 2017 WL 3208458, at *17.

Finally, the fact that Muniz-Espinoza's conduct occurred while he was "staying at [his] parent's house, the day after [he] arrived" in Mexico also weakens any argument that § 2423(c), as-applied to him implements the Optional Protocol. Arguably § 2423(c), Crime 1, was implementing legislation because the version of § 2423(c) that set forth solely that crimes was passed "just six days after the

Senate ratified the Optional Protocol." *Park*, 938 F.3d at 370; *see also* 18 U.S.C. § 2423(c) (2003). It was not until 2013 that "Congress amended § 2423(c) as part of the Violence Against Women Reauthorization Act, Pub. L. 113–3, § 1211(b) (2013)" to add a U.S. citizen who resides "either temporarily or permanently, in a foreign country, and engages in any illicit sexual conduct." *Pepe*, 895 F.3d at 686.

Because the evidence showed that Muniz-Espinoza engaged in the illicit sexual conduct after his travel ceased, Congress clearly did not think his behavior needed to be regulated as part of its implementation of the Optional Protocol.

## CONCLUSION

Accordingly, Muniz-Espinoza asks this Court to vacate his sentence and remand with instructions to dismiss the indictment.

Respectfully submitted.

s/ Shane O'Neal
SHANE O'NEAL
O'NEAL LAW
101 E. Avenue B
Alpine, Texas 79830
(713) 516-3505
shane@shaneoneallaw.com
*Attorney for Defendant-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2025, I electronically filed the Brief of Defendant-Appellant with the Clerk of Court using the CM/ECF system which will send notification of the filing to Justin R. Simmons, Interim U.S. Attorney for the Western District of Texas (Attn: Assistant U.S. Attorney Zachary Ricther), by electronic mail.

s/ Shane O'Neal
SHANE O'NEAL
*Attorney for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,951 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook in body text and 13-point in footnotes.

s/ Shane O'Neal
SHANE O'NEAL
*Attorney for Defendant-Appellant*
Dated: October 14, 2025